BOLIN, Justice.
These petitions for a writ of mandamus seek the dismissal of capital-murder indictments against two juvenile offenders based on Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and Mil *1264 ler v. Alabama, 567' U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). In Roper, the United States Supreme Court held that the Eighth Amendment bars capital punishment for juveniles, and, in Miller, the Supreme Court held that the Eighth Amendment forbids a sentencing scheme that mandates a sentence of life imprisonment without the possibility of parole for juveniles. Both juveniles argue that Alabama’s capital-murder statute is unconstitutional as applied to them because the mandatory sentencing structure provides that all defendants charged with a capital offense, including juveniles, must receive either a sentence of death or a mandatory sentence of life imprisonment without parole.

Facts and Procedural History

On October 22, 2010, Larry Henderson, age 16 at the time of the offense, was indicted in Jefferson County for murder made capital because it was committed during the course of robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. On July 3, 2012, Henderson filed a motion to dismiss the capital-murder charge, arguing that the State may proceed with other charges against him but that the capital-murder charge must be dismissed because the mandatory punishment of life imprisonment without the possibility of parole for a juvenile is unconstitutional. On July 24, 2012, the trial court denied Henderson’s motion to dismiss. On July 26, 2012, Henderson filed a petition for a writ of mandamus in the Court of Criminal Appeals. That same day, Henderson also filed a motion to stay the trial proceedings, which the Court of Criminal Appeals granted. On October 16, 2012, the Court of Criminal Appeals entered an order denying Henderson’s petition. That court stated:
“Larry Henderson filed this petition for a writ of mandamus requesting that we direct Judge Alfred Bahakel to grant his motion to dismiss the capital-murder charges against him because, he says, the United States Supreme Court’s decision in Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455 (2012), held that he cannot be sentenced to a term of life imprisonment without the possibility of parole. In October 2010, Henderson, who was 16 years of age at the time of the offense, was indicted for murdering Alex Rogers during the course of a robbery, a violation of § 13A-5-40(a)(2), Ala.Code 1975. In July 2012, Henderson moved to dismiss the indictment citing the recent case of Miller v. Alabama. The Supreme Court in Miller held that a mandatory term of life imprisonment without parole for a juvenile under the age of 18 at the time he committed murder was a violation of the Eight Amendment prohibition against cruel and unusual punishment. In his motion to dismiss, Henderson argued that ‘The State cannot proceed on a capital offense charge where the only punishment is life without parole for a juvenile, as such has been declared unconstitutional by the United States Supreme Court.’ The United States Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005), previously held that a sentence of death for a juvenile under the age of 18 when he committed the offense was unconstitutional.
“The State asserts that the United States Supreme Court in Miller did not vacate Miller’s conviction, but only his mandatory sentence, and that the opinion affects only Henderson’s sentence and not his conviction.
“The Supreme Court in Miller addressed the validity only of Miller’s sentence. The Supreme Court did not state that all sentences of life imprisonment without parole for juveniles who commit murder were barred, but that an individ *1265 ualized sentencing determination must be made at which time mitigating circumstances may be presented. Those state courts that have considered a juvenile case in light of Miller v. Alabama have remanded those cases for resen-tencing. See Henry v. State, (No. 05-11-00676-CR, August 24, 2012) (Tex. App.2012) (not reported in S.W.3d); People v. Leak, (No. 304713, August 2, 2012) (Mieh.Ct.App.2012) (not reported in N.W.2d); Commonwealth v. Knox, 50 A.3d 749 (Pa.Super.Ct.2012)(remanded the case for resentencing in light of Miller)-, State v. Lockheart, (No. 10-1815, July 11, 2012) (Iowa Ct.App.2012) (final publication pending); State v. Bennett, (No. 11-0061, July 11, 2012) (Iowa Ct. App.2012) (unpublished opinion).
“Henderson has failed to show a clear legal right to have the capital-murder indictment against him dismissed. Accordingly, this petition for a writ of mandamus is denied.”
On July 13, 2012, Rashad Stoves, age 17 at the time of the offense, was indicted in Jefferson County for murder made capital because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), and murder made capital because two or more persons were killed, see § 13A-5^L0(a)(10), Ala.Code 1975. On September 5, 2012, Stoves filed a motion to dismiss the capital-murder charges, arguing that the State cannot prosecute a juvenile for a capital offense where the only two possible punishments are death or life imprisonment without the possibility of parole. On September 13, 2012, the trial court denied the motion to dismiss, stating:
“The United States Supreme Court in Miller v. Alabama, [567 U.S.-,] 132 S.Ct. 2455 (2012), rendered unconstitutional the mandatory imposition of life without parole for those defendants under the age of 18 at the time of their alleged offense. This decision did not have the effect of invalidating capital offenses as they apply to these defendants. It instead altered the mandatory punishment component.”
On September 28, 2012, Stoves filed a petition for a writ of mandamus with the Court of Criminal Appeals. On November 8, 2012, the Court of Criminal Appeals entered an order denying Stoves’s petition, which order was substantially the same as the order entered on Henderson’s petition.
Both Henderson and Stoves timely filed petitions for writs of mandamus with this Court. We have consolidated these petitions for the purpose of writing one opinion, and we hereinafter refer to Henderson and Stoves collectively as “the juveniles.”

Standard of Review

“ ‘A writ of mandamus is an extraordinary remedy, and it “will be issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.” ’ ”
Ex parte Monsanto Co., 862 So.2d 595, 604 (Ala.2003) (quoting Ex parte Butts, 775 So.2d 173, 176 (Ala.2000), quoting in turn Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993)).
Rule 21(e)(1), Ala. R.App. P., provides, in pertinent part:
“(1) A decision of a court of appeals on an original petition for writ of mandamus or prohibition or other extraordinary writ (i.e., a decision on a petition filed in the court of appeals) may be reviewed de novo in the supreme court, and an application for rehearing in the court of appeals is not a prerequisite for such review. If an original petition for *1266 extraordinary relief has been denied by the court of appeals, review may be had by filing a similar petition in the supreme court (and, in such a case, in the supreme court the petition shall seek a writ directed to the trial judge).”
The juveniles seek a dismissal of their indictments. Rule 13.5(c), Ala. R.Crim. P., provides:
“(c) Effect of Defect in Charge.
“(1) A motion to dismiss the indictment may be based upon objections to the venire, the lack of legal qualifications of an individual grand juror, the legal insufficiency of the indictment, or the failure of the indictment to charge an offense.
“(2) No charge shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, for any defect or imperfection in the charge which does not tend to prejudice the substantial rights of the defendant upon the merits.”
Rule 13.5(c) allows for a pretrial dismissal of an indictment based upon “the legal insufficiency of the indictment, or the failure of the indictment to charge an offense.” The juveniles’ arguments that the capital-murder indictments were unconstitutional as applied to them in that the indictments failed to charge them with a valid crime under the United States Constitution is the proper subject of a petition for a writ of mandamus seeking review of the orders denying their motions to dismiss the indictments.

Discussion

The Eighth Amendment to the United States Constitution provides that “[e]xcessive bail shall not be required, nor excessive fines, nor cruel and unusual punishments inflicted.” The United States Supreme Court has explained:
“The Eighth Amendment’s prohibition of cruel and unusual punishment ‘guarantees individuals the right not to be subjected to excessive sanctions.’ Roper [■v. Simmons ], 543 U.S. [551,] 560 [ (2005) ]. That right, we have explained, ‘flows from the basic “precept of justice that punishment for crime should be graduated and proportioned” ’ to both the offender and the offense. Ibid. (quoting Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). As we noted the last time we considered life-without-parole sentences imposed on juveniles, ‘[t]he concept of proportionality is central to the Eighth Amendment.’ Graham [v. Florida ], 560 U.S. 48, 59[, 130 S.Ct. 2011, 2021 (2010) ]. And we view that concept less through a historical prism than according to ‘ “the evolving standards of decency that mark the progress of a maturing society.’” Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(quoting Trop v. Dulles, 356 U.S. 86,101 (1958) (plurality opinion)).”
Miller v. Alabama, 567 U.S. at-, 132 S.Ct. at 2463.
In order to address whether the juveniles’ capital-murder indictments should be dismissed, we must first discuss the United States Supreme Court’s jurisprudence regarding sentencing for juveniles convicted of capital offenses.
In Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), a plurality of the Supreme Court invalidated the death penalty for juveniles younger than 16 years old at the time of their offense who had been sentenced under statutory schemes specifying “no minimum age at which the commission of a capital crime can lead to the offender’s execution.” 487 U.S. at 857-58 (O’Con-nor, J., concurring). The plurality began by restating that the authors of the Eighth *1267 Amendment did not attempt to define the contours of cruel and unusual punishment, but “delegated that task to future generations of judges who have been guided by the ‘evolving standards of decency that mark the progress of a maturing society.’ ” 487 U.S. at 821 (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). The Court then determined society’s evolving standards of decency by reviewing the work product of state legislatures and sentencing juries and judges:
“The line between childhood and adulthood is drawn in different ways by various States. There is, however, complete or near unanimity among all 50 States and the District of Columbia in treating a person under 16 as a minor for several important purposes. In no State may a 15-year-old vote or serve on a jury. Further, in all but one State a 15-year-old may not drive without parental consent, and in all but four States a 15-year-old may not marry without parental consent. Additionally, in those States that have legislated on the subject, no one under age 16 may purchase pornographic materials (50 States), and in most States that have some form of legalized gambling, minors are not permitted to participate without parental consent (42 States). Most relevant, however, is the fact that all States have enacted legislation designating the maximum age for juvenile court jurisdiction at no less than 16. All of this legislation is consistent with the experience of mankind, as well as the long history of our law, that the normal 15-year-old is not prepared to assume the full responsibilities of an adult.
“Most state legislatures have not expressly confronted the question of establishing a minimum age for imposition of the death penalty. In 14 States, capital punishment is not authorized at all, and in others capital punishment is authorized but no minimum age is expressly stated in the death penalty statute. One might argue on the basis of this body of legislation that there is no chronological age at which the imposition of the death penalty is unconstitutional and that our current standards of decency would still tolerate the execution of 10-year-old children. We think it self-evident that such an argument is unacceptable; indeed, no such argument has been advanced in this case. If, therefore, we accept the premise that some offenders are simply too young to be put to death, it is reasonable to put this group of statutes to one side because they do not focus on the question of where the chronological age line should be drawn. When we confíne our attention to the 18 States that have expressly established a minimum age in their -death-penalty statutes, we find that all of them require that the defendant have attained at least the age of 16 at the time of the capital offense.
“The conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community. Thus, the American Bar Association and the American Law Institute have formally expressed their opposition to the death penalty for juveniles. Although the death penalty has not been entirely abolished in the United Kingdom or New Zealand (it has been abolished in Australia, except in the State of New South Wales, where it is available for treason and piracy), in neither of those countries may a juvenile *1268 be executed. The death penalty has been abolished in West Germany, France, Portugal, The Netherlands, and all of the Scandinavian countries, and is available only for exceptional crimes such as treason in Canada, Italy, Spain, and Switzerland. Juvenile executions are also prohibited in the Soviet Union.”
487 U.S. at 824-31 (footnotes omitted).
The Court in Thompson went on to address the second societal factor regarding the behavior of juries, noting the infrequency of juries’ imposing the death penalty on offenders under the age of 16. The Court explained:
“It is generally agreed ‘that punishment should be directly related to the personal culpability of the criminal defendant.’ California, v. Brown, 479 U.S. 538, 545 (1987)(0’Connor, J., concurring). There is also broad agreement on the proposition that adolescents as a class are less mature and responsible than adults. We stressed this difference in explaining the importance of treating the defendant’s youth as a mitigating factor in capital cases:
“ ‘But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly “during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment” expected of adults. Bellot-ti v. Baird, 443 U.S. 622, 635 (1979).’ Eddings v. Oklahoma, 455 U.S. 104, 115-116 (1982) (footnotes omitted).
“To add further emphasis to the special mitigating force of youth, Justice Powell quoted the following passage from the 1978 Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders:
“ ‘ “[Ajdolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime as such is not exclusively the offender’s fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America’s youth.” ’ 455 U.S., at 115, n. 11.
“Thus, the Court has already endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. The basis for this conclusion is too obvious to require extended explanation. Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.”
487 U.S. at 834-35 (footnotes omitted).
*1269 The last discussion of the plurality in Thompson was the dual purposes of retribution and deterrence of prospective offenders served by the death penalty. The Court concluded that given the lesser culpability of a juvenile offender, the juvenile’s capacity for growth, and society’s fiduciary obligations to its children, retribution was inapplicable to the execution of a 15-year-old. The Court also concluded that the deterrence purpose is equally unacceptable with regard to juveniles because it would be highly unlikely that the teenage offender has made the kind of cold-blooded, cost-benefit analysis that attaches any weight to the possibility of execution, and because it is fanciful to believe that a 15-year-old would be deterred by the knowledge that a small number of persons his age have been executed during the 20th century.
Shortly thereafter, in 1989, a plurality of the Supreme Court affirmed death-penalty sentences for a 16-year-old and a 17-year-old in Stanford v. Kentucky, 492 U.S. 861, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). In Stanford, the Supreme Court concluded that there was no national consensus prohibiting the execution of juvenile offenders who commit murder at 16 or 17 years of age. The Court noted that, of the 37 legislatures whose laws permitted capital punishment, 15 declined to impose it upon 16- and 17-year-old offenders and this did not establish the degree of national consensus the Court had previously thought sufficient to label a particular punishment cruel and unusual.
The defendants in Stanford argued that even if the laws do not establish a consensus, the reluctance of prosecutors to seek and juries to impose capital punishment shows that contemporary society views capital punishment as inappropriate. The Stanford Court stated that given the undisputed fact that a far smaller percentage of capital crimes are committed by persons under the age of 18, the discrepancy in treatment is much less than it might seem. The Court noted that such a discrepancy does not establish that the death penalty for persons under 18 is categorically unacceptable to prosecutors and juries.
In response to the defendants’ argument that juveniles are not trusted with the privileges and responsibilities of adults and, therefore, that juveniles’ irresponsible conduct should not be viewed as being as morally reprehensible as that of adults, the Stanford Court stated:
“This last point suggests why there is also no relevance to the laws cited by petitioners and their amici which set 18 or more as the legal age for engaging in various activities, ranging from driving to drinking alcoholic beverages to voting. It is, to begin with, absurd to think that one must be mature enough to drive carefully, to drink responsibly, or to vote intelligently, in order to be mature enough to understand that murdering another human being is profoundly wrong, and to conform one’s conduct to that most minimal of all civilized standards. But even if the requisite degrees of maturity were comparable, the age statutes in question would still not be relevant. They do not represent a social judgment that all persons under the designated ages are not responsible enough to drive, to drink, or to vote, but at most a judgment that the vast majority are not. These laws set the appropriate ages for the operation of a system that makes its determinations in gross, and that does not conduct individualized maturity tests for each driver, drinker, or voter. The criminal justice system, however, does provide individualized testing. In the realm of capital punishment in particular, ‘individualized consideration [is] a constitutional require *1270 ment,’ Lockett v. Ohio, 438 U.S. 586, 605 (1978) (opinion of Burger, C.J.)(footnote omitted); see also Zant v. Stephens, 462 U.S. 862, 879 (1983) (collecting cases), and one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant’s age, see Eddings v. Oklahoma, 455 U.S. 104, 115-116 (1982). Twenty-nine States, including both Kentucky and Missouri, have codified this constitutional requirement in laws specifically designating the defendant’s age as a mitigating factor in capital cases. Moreover, the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults. The application of this particularized system to the petitioners can be declared constitutionally inadequate only if there is a consensus, not that 17 or 18 is the age at which most persons, or even almost all persons, achieve sufficient maturity to be held fully responsible for murder; but that 17 or 18 is the age before which no one can reasonably be held fully responsible. What displays society’s views on this latter point are not the ages set forth in the generalized system of driving, drinking, and voting laws cited by petitioners and their ami-ci, but the ages at which the States permit their particularized capital punishment systems to be applied.”
492 U.S. at 374-77 (footnotes omitted). The Supreme Court also rejected the defendants’ arguments that legitimate goals of penology, e.g., deterrence and retribution, invalidated the reasons for capital punishment of 16- and 17-year-olds. The defendants had argued that capital punishment fails to deter because juveniles have less developed cognitive skills than adults and are less likely to fear death and that capital punishment fails to exact retribution because juveniles are less mature and less responsible and, consequently, less morally blameworthy. The Court concluded:
“If such evidence could conclusively establish the entire lack of deterrent effect and moral responsibility, resort to the Cruel and Unusual Punishments Clause would be unnecessary; the Equal Protection Clause of the Fourteenth Amendment would invalidate these laws for lack of rational basis. See Dallas v. Stanglin, 490 U.S. 19 (1989). But as the adjective ‘socioscien-tific’ suggests (and insofar as evaluation of moral responsibility is concerned perhaps the adjective ‘ethicoscientific’ would be more apt), it is not demonstrable that no 16-year-old is ‘adequately responsible’ or significantly deterred. It is rational, even if mistaken, to think the contrary. The battle must be fought, then, on the field of the Eighth Amendment; and in that struggle socioseientific, ethicoscientific, or even purely scientific evidence is not an available weapon. The punishment is either ‘cruel and unusual’ (i.e., society has set its face against it) or it is not. The audience for these arguments, in other words, is not this Court but the citizenry of the United States. It is they, not we, who must be persuaded. For as we stated earlier, our job is to identify the ‘evolving standards of decency’; to determine, not what they should be, but what they are. We have no power under the Eighth Amendment to substitute our belief in the scientific evidence for the society’s apparent skepticism. In short, we emphatically reject petitioner’s suggestion that the issues in this case permit us to apply our ‘own informed judgment,’ Brief for Petitioner in No. 87-6026, p. *1271 28, regarding the desirability of permitting the death penalty for crimes by 16- and 17-year-olds.
“We reject the dissent’s contention that our approach, by ‘largely return[ing] the task of defining the contours of Eighth Amendment protection to political majorities,’ leaves ‘ “[constitutional doctrine [to] be formulated by the acts of those institutions which the Constitution is supposed to limit,” ’ post, at 391, 892 (citation omitted). When this Court cast loose from the historical moorings consisting of the original application of the Eighth Amendment, it did not embark rudderless upon a wide-open sea. Rather, it limited the Amendment’s extension to those practices contrary to the ‘evolving standards of decency that mark the progress of a maturing society.’ Trop v. Dulles, 356 U.S. [86], at 101 [(1958)] (plurality opinion)(emphasis added). It has never been thought that this was a shorthand reference to the preferences of a majority of this Court. By reaching a decision supported neither by constitutional text nor by the demonstrable current standards of our citizens, the dissent displays a failure to appreciate that ‘those institutions which the Constitution is supposed to limit’ include the Court itself. To say, as the dissent says, that ‘ “it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty,” ’ post, at 391 (emphasis added), quoting Enmund v. Florida, 458 U.S. [782], at 797 [ (1982) ] — and to mean that as the dissent means it, ie., that it is for us to judge, not on the basis of what we perceive the Eighth Amendment originally prohibited, or on the basis of what we perceive the society through its democratic processes now overwhelmingly disapproves, but on the basis of what we think ‘proportionate’ and ‘measurably contributory to acceptable goals of punishment’ — to say and mean that, is to replace judges of the law with a committee of philosopher-kings.”
492 U.S. at 378-79.
We note that the same day the United States Supreme Court released Stanford, it released Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), in which the Court held that the Eighth Amendment did not mandate a categorical exemption from the death penalty for the mentally retarded. In 2002, the Supreme Court revisited the issue in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Atkins Court concluded that standards of decency had evolved since Penry and a national consensus had developed against the execution of the mentally retarded. Along with that national consensus, the Court identified two reasons to categorically exclude the mentally retarded from the death penalty: the impairments of the mentally retarded offenders make it less defensible to impose the death penalty as retribution for past crimes and less likely that the death penalty will have a deterrent effect, and the reduced capacity of mentally retarded offenders places them at greater risk of wrongful execution.
In 2005, the Supreme Court revisited whether it was permissible under the Eighth Amendment and the Fourteenth Amendment to execute a juvenile offender who was younger than 18 years of age. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, a majority of the Supreme Court categorically prohibited the imposition of the death penalty against defendants who committed a capital offense before the age of 18. Simmons was 17 years old when he and a juvenile accomplice broke into the victim’s house with the stated intent to kill whomever they found inside. Simmons as *1272 sured his accomplice that they could get away with the murder because they were under the age of 18. After breaking into the victim’s house, Simmons recognized the victim because the two had been involved in an automobile accident months earlier. Simmons bound the victim’s eyes, mouth, hands, and feet, covered her face with a towel, and threw her from a railroad trestle into a body of water, where she drowned. Simmons was charged with burglary, kidnapping, stealing, and first-degree murder, and he was tried as an adult. Simmons was convicted and was sentenced to death. The Missouri Supreme Court reversed the sentence in Simmons’s habeas corpus proceedings brought against the superintendent of the correctional facility where Simmons was being housed. The superintendent appealed to the United States Supreme Court for reinstatement of the death penalty, arguing that the Missouri Court had misinterpreted United States Supreme Court precedent.
The United States Supreme Court concluded that by 2005 there was a national consensus against the death penalty for juveniles, as 30 states prohibited the death penalty for juveniles (12 rejecting the death penalty altogether and 18 maintaining the death penalty but either expressly or by judicial interpretation excluding the death penalty for juveniles). The Court also noted that the practice of executing juveniles was infrequent in those states without a formal prohibition against the practice.
The Court in Roper v. Simmons recognized three broad differences between juveniles under 18 and adults. The Court cited a number of scientific studies indicating that a juvenile’s lack of maturity and underdeveloped sense of responsibility often result in impetuous and ill-considered actions and decisions. The Court also noted that juveniles differ from adults in that they are more susceptible to negative influences and outside pressures,, including peer pressure. The third broad difference is that a juvenile’s character is not as well formed as that of an adult, i.e., the personalty traits of juveniles are more transitory and less fixed. The Supreme Court concluded that based upon the diminished capacity of juveniles, retribution and deterrence do not provide a justification for imposing the death penalty on juveniles.
In 2010, the Supreme Court addressed whether the Eighth Amendment prohibits the imposition of a sentence of life imprisonment without the possibility of parole on juvenile offenders who have committed nonhomicide offenses. Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Terrence Graham was 16 years old when he and a friend put on masks and entered a restaurant at closing time through a rear entrance an accomplice had unlocked. Although their robbery attempt failed, one of Graham’s accomplices hit the restaurant manager with a steel bar. Graham pleaded guilty in adult court to “armed burglary with assault” and to “attempted armed robbery,” and the trial court withheld adjudication of guilt and sentenced him to 3 years’ probation, including 12 months in jail (Graham received credit for the time he had served awaiting trial and was released). Six months later, Graham and two accomplices broke into a house and Graham held a gun to the homeowner’s head and took a gold crucifix during the robbery. That same night, one of Graham’s accomplices was shot during an attempt at another robbery, and, when Graham dropped his accomplice off at the hospital, he almost crashed into a sheriffs car, which Graham then led on a high-speed chase. Following Graham’s arrest, his probation officer filed an affidavit asserting that Graham had violated his pro *1273 bation by possessing a firearm, by committing new crimes, and by associating with persons engaged in criminal activity. Graham was sentenced to life imprisonment, and, because Florida had abolished its parole system, a sentence of life imprisonment gave him no possibility of parole.
The Supreme Court in Graham held that a sentence of life imprisonment without the possibility of parole for juveniles not charged with a homicide violates the Eighth Amendment. Applying the same analysis used in Roper, the Supreme Court began by examining legislative enactments to determine whether a national consensus against sentencing juveniles to life imprisonment without the possibility of parole existed. The Supreme Court noted that although 37 states and the District of Columbia allow such sentences, actual sentencing practices indicate that such sentences are imposed infrequently. Eleven jurisdictions nationwide impose life-imprisonment-without-parole sentences on juvenile offenders, while 26 states, the District of Columbia, and the federal government do not impose them. Graham, 560 U.S. at 62-68, 130 S.Ct. at 2023. The Court concluded that because the sentencing practice was exceedingly rare, “ ‘it is fair to say that a national consensus has developed against it.’ ” Graham, 560 U.S. at 67, 130 S.Ct. at 2026 (quoting Atkins v. Virginia, 536 U.S. at 316). In short, even though a majority of states allowed a sentence of life imprisonment without parole for non-homicide juvenile offenders, the Supreme Court concluded that the fact that the option was rarely used amounted to a consensus against the practice.
Although the Supreme Court determined that that consensus was entitled to great weight, the Court stated that it must still exercise its independent judgment to determine whether the Eighth Amendment prohibits imposing upon a juvenile who has committed a nonhomicide offense a sentence of life imprisonment without the possibility of parole. Graham, 560 U.S. at 67, 130 S.Ct. at 2026. Exercising independent judgment required the Court to consider the culpability of the offenders, the severity of the punishment, and the legitimate penological goals served by the sentencing practice. Graham, 560 U.S. at 67, 130 S.Ct. at 2026. Discussing its rationale in Roper that juveniles have lessened culpability because of their lack of maturity and their underdeveloped sense of responsibility, their, susceptibility to outside pressures, and their character, which is still being formed, the Supreme Court concluded that the penological justifications for a life-imprisonment-without-parole sentence for nonhomicide offenses were not served when the defendant was a juvenile.
The Supreme Court recognized that prohibiting a life-imprisonment-without-parole sentence for a juvenile nonhomicide offender did not mean that the juvenile would be guaranteed to be eventually released.
“A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence to a juvenile offender, it does not require the State to release the offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth *1274 Amendment does not foreclose the possibility that persons convicted of nonho-micide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.”
560 U.S. at 75,130 S.Ct. at 2030.
The Graham Court determined that state criminal-procedure laws requiring consideration of the offender’s age as it related to a prosecutor’s charging decisions did not mitigate the need for a categorical rule prohibiting the imposition 'of a sentence of life imprisonment without parole on a juvenile nonhomicide offender, because sentencing a juvenile nonhomicide offender based on a subjective judgment that the juvenile’s crimes demonstrate an irretrievably depraved character would be inconsistent with the Eighth Amendment. The Supreme Court noted that the judgments of other nations and the international community generally reject such a sentencing practice. Although not dispositive as to the meaning of the Eighth Amendment, the Supreme Court posited that international opinion on the practice is not irrelevant.-
Most recently, the Supreme Court in Miller v. Alabama, supra, addressed whether- the Eighth Amendment forbids a sentencing scheme that mandates a sentence of life imprisonment without the possibility of parole for juvenile offenders who have committed homicides. Miller involved two cases in which the offenders were 14-year-olds. The first juvenile, Kuntrell Jackson, and two other boys decided to rob a video store in Blythville, Arkansas. On the way to the store, Jackson learned that-one of the boys, Derrick Shields, was carrying a sawed-off shotgun in his clothing. Jackson decided to stay outside when the two other boys entered the store. Shields pointed the gun at the store clerk and demanded money. The clerk refused. A few moments later, Jackson went into the store, where Shields was still demanding money from the clerk. The clerk threatened to call the police, and Shields shot and killed her. Arkansas law provides that a juvenile may be tried as an adult, and it further provides that a defendant convicted of capital murder shall be sentenced to death or to life imprisonment without the possibility of parole.
The other case involved 14-year-old Evan Miller, who was at home in Lawrence County, Alabama, with a friend when a neighbor came to the house to make a drug deal with Miller’s mother. The two boys followed the neighbor back to his trailer, where all three smoked marijuana and consumed alcohol. When the neighbor passed out, Miller stole his wallet, splitting the $300 in the wallet with his friend. Miller then tried to put the wallet back in the neighbor’s pocket, but the neighbor woke up and grabbed Miller by the throat. The friend hit the neighbor with a baseball bat, and, once released from the neighbor’s grasp, Miller grabbed the bat and repeatedly struck the neighbor. The juveniles left but returned to cover up evidence of their crime. They lit two fires, and the neighbor eventually died from his injuries and smoke inhalation.
Both Miller and Jackson were tried as adults, convicted, and sentenced to the mandatory sentence of life imprisonment without the possibility of parole because the Supreme Court’s decision in Roper had invalidated the death penalty for juveniles. The Supreme Court first looked at its categorical bans on sentencing practices based on mismatches between culpability of a class of offenders and the severity of the penalty. The Supreme Court cited Roper, Graham, Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 *1275 (2008), and Atkins. The Court also looked at cases where it had prohibited mandatory imposition of capital punishment, instead requiring that sentencing authorities consider the characteristics of a defendant and the details of the offense before sentencing the defendant to death, citing Woodson v. North Carolina, 428 U.S. 280, 804, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (holding that the mandatory sentencing scheme was flawed because it gave no significance to “the character and record of the individual offender or the circumstances” of the offense and “exclud[ed] from consideration ... the possibility of compassionate or mitigating factors”), and Lockett v. Ohio, 488 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (holding that sentencing scheme that permitted a limited range of mitigating evidence was unconstitutional because “the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death”). The Miller Court concluded that these two strands of precedent led it to conclude that a mandatory sentence of life imprisonment without the possibility of parole for juveniles violated the prohibition against cruel and unusual punishment in the Eighth Amendment.
The Miller Court discussed Roper and Graham at length and recognized that “distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.” 567 U.S. at -, 132 S.Ct. at 2465. The Miller Court stated:
“In light of Graham ⅛ reasoning, these decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other — the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses — but really, as Graham noted, a greater sentence than those adults will serve. In meting out the death penalty, the elision of all these differences would be strictly forbidden. And once again, Graham indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison.
“So Graham and Roper and our individualized sentencing cases alike teach that in imposing a State’s harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with *1276 youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, e.g., Graham, 560 U.S., at 78[, 130 S.Ct. at 2032] (‘[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings’); J.D.B. v. North Carolina, 564 U.S. -[, 131 S.Ct. 2394] (2011) (discussing children’s responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.
[[Image here]]
“We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. Graham, 560 U.S., at 75[, 130 S.Ct. at 2030] (‘A State is not required to guarantee eventual freedom,’ but must provide ‘some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation’). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider Jackson’s and Miller’s alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in Roper, Graham, and this decision about children’s diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between ‘the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.’ Roper, 543 U.S., at 573; Graham, 560 U.S., at 68[, 130 S.Ct. at 2026-27]. Although we do not foreclose a sentencer’s ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.”
567 U.S. at-, 132 S.Ct. at 2467-70.
The Supreme Court found unpersuasive Alabama’s and Arkansas’s argument that requiring individualized consideration before sentencing a juvenile offender to life imprisonment without the possibility of parole is unnecessary because individualized circumstances come into play in deciding whether to try a juvenile offender as an adult. In short, those States argued that courts and prosecutors consider a juvenile’s age and the circumstances of the crime in determining whether to try the juvenile as an adult in the first place. The Court found that this argument ignores that many states use a mandatory transfer system. Also, some states place the decision with prosecutors, rather than with the court. The Miller Court recognized that even where judges have discretion at the transfer stage, that discretion is of limited utility because the court will typically have only partial information about the juvenile or the circumstances of the juvenile’s crime. Last, the Court stated:
“[S]till more important, the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present *1277 a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole). In many States, for example, a child convicted in juvenile court must be released from custody by the age of 21. See, e.g., Ala.Code § 12-15-117(a)(Cum.Supp.2011); see generally 2006 National Report 103 (noting limitations on the length of juvenile court sanctions). Discretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term with the possibility of parole or a lengthy term of years. It is easy to imagine a judge deciding that a minor deserves a (much) harsher sentence than he would receive in juvenile court, while still not thinking life-without-parole appropriate. For that reason, the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court — and so cannot satisfy the Eighth Amendment.”
567 U.S. at-, 182 S.Ct. at 2474-75.
The Miller Court also rejected Alabama’s and Arkansas’s argument that because 28 states and the federal government make a life-imprisonment-without-parole sentence mandatory for some juveniles convicted of murder in adult court, the holdings in Roper and Graham show a national consensus for a sentence for a particular class of offenders. The Court stated:
“[Wje think the States’ argument on this score weaker than the one we rejected in Graham. For starters, the cases here are different from the typical one in which we have tallied legislative enactments. Our decision does not categorically bar a penalty for a class of offenders or type of crime — as, for example, we did in Roper or Graham. Instead, it mandates only that a sentencer follow a certain process — considering an offender’s youth and attendant characteristics — before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of Roper, Graham, and our individualized sentencing cases that youth matters for purposes of meting out the law’s most serious punishments. When both of those circumstances have obtained in the past, we have not scrutinized or relied in the same way on legislative enactments. See, e.g., Sumner v. Shuman, 483 U.S. 66 [ (1987) ] (relying on Woodson’s logic to prohibit the mandatory death penalty for murderers already serving life without parole); Lockett, 438 U.S., at 602-608 (plurality opinion)(applying Wood-son to require that judges and juries consider all mitigating evidence); Ed-dings [u Oklahoma ], 455 U.S. [104], at 110-117 [ (1982) ] (similar). We see no
“In any event, the ‘objective indicia’ that the States offer do not distinguish these cases from others holding that a sentencing practice violates the Eighth Amendment. In Graham, we prohibited life-without-parole terms for juveniles committing nonhomicide offenses even though 39 jurisdictions permitted that sentence. See 560 U.S., at 62-63[, 130 S.Ct. at 2023]. That is 10 more than impose life without parole on juveniles on a mandatory basis. And in Atkins, Roper, and Thompson, we similarly banned the death penalty in circumstances in which ‘less than half of the ‘States that permitted] capital punishment (for whom the issue exist[ed])’ had previously chosen to do so. Atkins, 536 U.S., at 342 (Scalia, J., dissenting) (emphasis deleted); see id., at 313-315 (majority opinion); Roper, 543 U.S., at 564-565; Thompson, 487 U.S., at 826-827 *1278 (plurality opinion). So we are breaking no new ground in these cases.
[[Image here]]
“All that is just as true here. Almost all jurisdictions allow some juveniles to be tried in adult court for some kinds of homicide. See Dept, of Justice, H. Snyder & M. Sickmund, Juvenile Offenders and Victims: 2006 National Report 110-114 (hereinafter 2006 National Report). But most States do not have separate penalty provisions for those juvenile offenders. Of the 29 jurisdictions mandating life without parole for children, more than half do so by virtue of generally applicable penalty provisions, imposing the sentence without regard to age. And indeed, some of those States set no minimum age for who may be transferred to adult court in the first instance, thus applying life-without-parole mandates to children of any age — be it 17 or 14 or 10 or 6. As in Graham, we think that ‘underscores that the statutory eligibility of a juvenile offender for life without parole does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration.’ 560 U.S., at 67[, 130 S.Ct. at 2026]. That Alabama and Arkansas can count to 29 by including these possibly (or probably) inadvertent legislative outcomes does not preclude our determination that mandatory life without parole for juveniles violates the Eighth Amendment.”
567 U.S. at -, 132 S.Ct. at 2471-73 (footnotes omitted).
The evolution of the Supreme Court’s Eighth Amendment jurisprudence involving juvenile sentencing has resulted in heightened protections for juveniles based on the characteristics of youth. The “imposition of a State’s most severe penalties on juvenile offenders cannot proceed as though they were not children.” Miller, 567 U.S. at-, 132 S.Ct. at 2466. The Supreme Court concluded that the mandatory sentencing scheme was flawed because it did not give consideration to the character and record of the individual offender, the circumstances of the offense, or the possibility of compassionate or mitigating factors related to youth. It is with this in mind that we address whether the capital-murder indictments against the juveniles should be dismissed because only two punishments are permissible under § 13A-5-39, Ala.Code 1975, and neither the death penalty nor a mandatory sentence of life imprisonment without the possibility of parole may be imposed against a juvenile.
Section 13A-5-l(a), Ala.Code 1975, provides that every person convicted of any offense shall be sentenced in accordance with Criminal Code unless otherwise specifically provided by law.[1] Section 13A-5-39(a), Ala.Code 1975, defines a capital offense as “[a]n offense for which a defendant shall be punished by death or life imprisonment without the possibility of parole according to the provisions of this article.” Section 13A-5-40, Ala.Code 1975, sets out those murders that constitute capital offenses, including the offense charged on Henderson’s indictment — murder “during a robbery in the first degree or an attempt thereof,” § 13-5-40(a)(2) — and in Stoves’s indictment — murder “wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct,” § 13A-5-40(a)(10), and murder “during a robbery in the first degree or an attempt thereof,” § 13-5-40(a)(2). Section 13A-5-43(d), Ala. Code 1975, provides that if a defendant is *1279 found guilty of a capital offense with which he or she was charged, the sentence shall be determined as provided for in §§ 13A-5-45 through -58, Ala.Code 1975.
Section 13A-5^15(a), Ala.Code 1975, provides that if a defendant is convicted of a capital offense, the trial court shall hold a separate sentencing hearing “to determine whether the defendant shall be sentenced to life imprisonment without parole or to death.” The sentencing hearing is conducted before a jury unless the hearing before the jury is waived, and the jury shall issue an advisory verdict of “life imprisonment without parole” or death, depending on its findings of aggravating and mitigating circumstances. § 13A-5-46, Ala.Code 1975. Section 13A-5-47, Ala. Code 1975, provides that the jury’s advisory verdict is not binding on the trial court. Section 13A-5-48, Ala.Code 1975, provides that, in determining its advisory verdict, a jury is to weigh the aggravating and mitigating circumstances it finds to exist to determine whether the proper sentence is “life imprisonment without parole or death.” Sections 13A-5-49 through -51, Ala.Code 1975, address aggravating and mitigating circumstances. Section 13A-5-51(7), Ala.Code 1975, provides that the defendant’s age is a mitigating circumstance. Section 13A-5-52, Ala.Code 1975, provides that the defendant’s character or record and any of the circumstances of the offense offered by the defendant shall be included in determining whether the sentence should be “life imprisonment without parole instead of death.” Section 13A-5-53, Ala.Code 1975, provides for appellate review when the death penalty is imposed.
Section 13A-5-59, Ala.Code 1975, provides:
“It is the intent of the Legislature that if the death penalty provisions of this article are declared unconstitutional and if the offensive provision or provisions cannot be reinterpreted so as to provide a constitutional death penalty, or if the death penalty is ever declared to be unconstitutional per se, that the defendants who have been sentenced to death under this article shall be re-sentenced to life imprisonment without parole. It is also the intent of the Legislature that in the event that the death penalty provisions of this article are declared unconstitutional and if they cannot be reinterpreted to provide a constitutional death penalty, or if the death penalty is ever declared to be unconstitutional per se, that defendants convicted thereafter for committing crimes specified in Section 13A-5-40(a) shall be sentenced to life imprisonment without parole.”
Last, we note that § 13A-5-58, Ala.Code 1975, provides that “[t]his article shall be interpreted, and if necessary reinterpreted, to be constitutional.”
The substance of the juveniles’ arguments is contrary to the Court of Criminal Appeals’ conclusion that Miller v. Alabama concerned only a “sentencing issue” and did not address the validity of Alabama’s capital-offense statutory scheme as it applies to juveniles. Instead, the juveniles assert that under Alabama law the definition of a capital offense is intertwined with the prescribed punishment. Specifically, § 13A-5-39 defines a capital offense as “[a]n offense for which a defendant shall be punished by a sentence of death or life without parole.” The juveniles assert that, because the United States Supreme Court has categorically banned the death penalty for juveniles, the issue involves the “life-without-parole” provision and that there are no provisions in Alabama’s capital-offense statutory scheme that allow a trial court to impose a sentence less than life imprisonment without parole. The juveniles note that § 13A-1-6, Ala.Code 1975, *1280 provides that “[a]ll provisions of this title shall be construed according to the fair import of their terms.” The Commentary to § 13A-1-6 states that “not only must the alleged misconduct be covered by the ‘fair import’ of the Criminal Code provisions ... the statute must be construed so that it gives ‘fair warning of the nature of the conduct proscribed and the punishment authorized upon conviction.’ ” The juveniles contend that they would be denied basic due process if they are required to proceed to trial without knowing the punishment they are facing, becapse, under Miller, the mandatory life-imprisonment-without-parole sentence is no longer a constitutional option.
The Miller Court was careful to clarify that its holding was not a categorical prohibition of a sentence of life imprisonment without parole for juveniles, but rather required the sentencer to consider the juvenile’s age and age-related characteristics before imposing such a sentence. The Supreme Court did “not foreclose a sentencer’s ability to [impose a sentence of life imprisonment without parole for a juvenile] in homicide cases,” 567 U.S. at-, 132 S.Ct. at 2469, but required “only that a sentencer follow a certain process — considering an offender’s youth and attendant characteristics — before imposing” life without parole. 567 U.S. at -, 132 S.Ct. at 2471. Also, the Graham Court, in categorically barring a life-without-parole sentence for nonhomicide offenders, did not guarantee that a juvenile who committed a truly horrific crime would ever be released from imprisonment.
The Miller Court noted that Graham and Roper “establish that children are constitutionally different from adults for the purposes of sentencing.” 567 U.S. at -, 132 S.Ct. at 2464. It is these differences that preclude the mandate that a juvenile receive a sentence of life imprisonment without parole. “[A]n offender’s age is relevant to the Eighth Amendment and criminal procedure laws that fail to take defendants’ youthfulness into account at all would be flawed.” Graham, 560 U.S. at 76, 130 S.Ct. at 2031. Miller mandates individualized sentencing for juveniles charged with capital murder rather than a “one size fits all” imposition of a sentence of life imprisonment without the possibility of parole.
 As the Supreme Court stated in Miller, 567 U.S. at-, 132 S.Ct. at 2463, quoting Roper, 543 U.S. at 560, “[t]he Eighth Amendment’s prohibition of cruel and unusual punishment ‘guarantees individuals the right not to be subjected to excessive sanctions’.... That right ... ‘flows from the basic “precept of justice that punishment for crime should be graduated and proportioned” ’ to both the offender and the offense.” Miller held that for purposes of sentencing and punishment, juveniles “have diminished culpability and greater prospects for reform.” 567 U.S. at-, 132 S.Ct. at 2464. The Supreme Court in Miller was reviewing Alabama’s statutory capital-sentencing scheme. The Court discussed, but did not address, the validity of juvenile-transfer hearings by which a juvenile is transferred to adult court for trial. Instead, the Miller Court invalidated a mandatory sentencing scheme for juveniles, but it did not categorically ban a sentence of life imprisonment without parole.
We recognize that a capital offense is defined under our statutory scheme as one punishable by the two harshest criminal sentences available: death and life imprisonment without the possibility of parole.[2] Alabama’s statutory *1281 scheme goes on to define 18 classes of murders and the circumstances that make those murders subject to the harshest punishments under the law. The juveniles focus their arguments on the fact that the statutory scheme defines a capital offense as an offense punishable by death or life imprisonment without parole, and they argue that this definition requires that their indictments be dismissed because neither punishment is now available for juveniles. Although the death penalty has been categorically banned, a sentence of life imprisonment without the possibility of parole is still possible for a juvenile homicide offender. However, it cannot be automatically imposed as a sentence on a juvenile homicide offender based on the heightened protections established for sentencing juveniles as set out in the Supreme Court’s jurisprudence. The juveniles argue that they will not know the punishment they face because a mandatory sentence of life imprisonment without parole is no longer available. It is the mandatory, determined at the outset, imposition of a sentence of life imprisonment without parole when sentencing juveniles that is outside constitutional boundaries. It is not the actual sentence of life imprisonment without parole that was barred in Miller,[3] Instead, Miller requires that the sentence be reviewed for the possibility of parole. Miller ’s Eighth Amendment boundaries when sentencing a juvenile homicide offender now subject that sentence to the possibility of parole. Accordingly, the juveniles have actual notice that, if convicted, they face a sentence of life imprisonment without the possibility of parole as a “ceiling.” The juveniles have notice of the “floor” as well, because Miller requires that a juvenile convicted of capital murder is entitled to have his life sentence reviewed for the possibility of parole. It is well settled that should a statute become invalid or unconstitutional in part, the part that is valid will be sustained where it can be separated from that part that is void. King v. Campbell, 988 So.2d 969 (Ala.2007). Sections 18A-5-58 and -59 evidence the intent of the legislature that Alabama have a valid capital-murder statutory-sentencing scheme as it applies to adults and to juveniles tried as adults. Severing the mandatory nature of a life-without-parole sentence for a juvenile to provide for the ameliorative possibility of parole because of characteristics attendant to youth does not invalidate § 13A-5-39.
The juveniles argue that this Court would be rewriting the Alabama’s capital-murder statutory scheme if it concludes that a sentence other than the mandatory sentence of life imprisonment without the possibility of parole is available or, indeed, if we attempt to apply the principles established in Miller to a sentencing hearing. We note that this is not the first time this Court has applied the principles of a Supreme Court ease. In Swain v. State, 290 Ala. 123, 274 So.2d 305 (1973), Swain was convicted of rape and was sentenced to death. The sentencing scheme under which Swain was sentenced provided that rape was punishable, at the jury’s discretion, by death or by imprisonment for not less than 10 years. Swain’s death sentence was set aside after the Supreme Court held in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that the death penalty constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments when *1282 the statute under which it was imposed did not provide for channeling jury discretion to avoid arbitrary and capricious capital sentencing. In addressing the dissenting Justices’ suggestion that the Court order a new trial for Swain on the issue of punishment only, this Court stated:
“In effect, they contend that this solution is compelled because the United States Supreme Court mandated out the death sentence, and they reason the punishment to be imposed by a jury can vary from a minimum of ten years up to any number of years imprisonment in the penitentiary, and we cannot know what sentence a jury might impose.
“No statutory nor common law power exists in Alabama authorizing such a bifurcated jury trial. Any attempt to construct such a system (as the dissent suggests), novel to our jurisprudence, would create problems well nigh insoluble either by this court or by the trial court to which we might remand the matter.
“Is it not reasonable and logical to assume that if the jury (which tried this defendant and imposed the most extreme penalty of all-death) had been instructed that the death penalty would be an impermissible punishment, then the jury would have imposed the next most severe penalty?
“In Hubbard [v. State, 290 Ala. 118, 274 So.2d 298 (1973) ], we quoted from the ease of Anderson v. State, Fla., 267 So.2d 8 [ (1972) ]:
“ “We are aware of the many problems involved, when it is necessary to transport a large number of convicted murderers from the State prison to the trial court for the purpose of sentence. The safety of the law-abiding citizen is a matter of paramount concern to the Court. Also many hours of manpower would be consumed by law enforcement officers in transporting the prisoners. Some local jail facilities are crowded and inadequate. Since the death sentence has been outlawed, there is a greater possibility of murder for the sake of escape, particularly when the penalty to be imposed for the taking of an additional human life can be no greater than that previously imposed by the Court. The above factors are sufficient to create an exception to Rule 3.180, F.R.Cr.P., requiring the presence of the defendants at sentencing. Their absence deprives them of no rights.
“ ‘Every court has inherent powers to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, subject to, or not in conflict with valid existing laws and constitutional provisions. See 5 F.L.P., Courts, § 14, and cases cited.
“ ‘Under the circumstances of these particular cases, it is our opinion that we should correct the illegal sentences previously imposed without returning the prisoners to the trial court.’
“It is our judgment that all of these reasons and others compel the solution we reach, which is to correct the sentence to impose a life sentence in lieu of the death penalty.
“This is the conclusion reached by the Louisiana Supreme Court in State v. Williams, 263 La. 284, 268 So.2d 227 [ (1972) ]; the Georgia Supreme Court in Sullivan v. State, [M.S.1972] [229] Ga. [731], 194 S.E.2d 410; and the North Carolina Supreme Court in State v. Waddell, 282 N.C. 431, 194 S.E.2d 19 [(1973)]
“We agree with the Louisiana Supreme Court, which held in State v. Williams, supra:
*1283 “We construe the Mandate of the United States Supreme Court to require the imposition of a sentence other than death. * * * ’
“Thus, the sentence of death imposed upon the defendant, Robert Swain, is vacated and set aside. In lieu and instead thereof, the sentence is corrected to provide that the said Robert Swain be imprisoned in the State penitentiary for the term of his natural life.”
290 Ala. at 124-25, 274 So.2d at 805-06 (emphasis added).
In Beck v. State, 396 So.2d 645, 648 (Ala.1981), this Court “exercise[d] its inherent power to formulate guidelines which the Supreme Court of the United States has judicially determined to be constitutionally required in death cases.” In Beck, we examined a former version of Alabama’s capital-murder statute following a series of decisions by the Supreme Court (including Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2882, 65 L.Ed.2d 392 (1980)), in order to ensure that it met constitutional standards. Rather than require the Alabama Legislature to rewrite the capital-murder statute to conform to constitutional requirements recently set out in those Supreme Court decisions, we held that the legislature intended to write a constitutional statute. Our guidelines included the requirement mandated by Beck v. Alabama that the jury be permitted to consider lesser-included offenses. We also established a procedure that made the jury more involved in sentencing by adopting a bifurcated trial procedure. In Thigpen v. Thigpen, 541 So.2d 465 (Ala.1989), we answered a certified question as to whether a defendant could be resentenced to death or should have his existing death sentence reduced to life imprisonment following the Supreme Court’s decision in Sumner v. Shuman, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), which struck as unconstitutional a mandatory capital statute similar to Alabama’s former statute. We answered that the defendant could not be resentenced to death. On rehearing, the State complained that
“this Court did not explicitly state that Thigpen can now be sentenced to life in prison without a retrial. Strictly speaking, this question is not presented in the certified question, if only because Thig-pen’s challenges to the validity of his conviction have not yet been answered with finality in the federal habeas corpus proceedings; indeed, the State did not ask this Court to express such an opinion in the event that we rejected its arguments that Thigpen is subject to the death penalty.
“However, in the interest of judicial economy, we deem it appropriate to point out principles applicable to the question of resentencing Thigpen in the event his conviction withstands challenge .... ”
541 So.2d at 467 (emphasis added). The juveniles seek dismissal of their indictments based on Miller and have, for the first time, placed the mandates of Miller squarely before this Court. In accordance with the principles of Miller and with our discretion to apply those principles, we opt to provide the trial courts with guidance in the event the juveniles are convicted of capital murder.
We agree with the juveniles that the Miller Court did not delineate specifically which factors to use in sentencing a juvenile convicted of a capital offense. We find helpful Commonwealth v. Knox, 50 A.3d 732 (Pa.Super.Ct.2012), which ordered that a juvenile sentenced to a mandatory life-without-parole sentence must be resentenced with a consideration of the *1284 principles annunciated in Miller.[4] We hold that a sentencing hearing for a juvenile convicted of a capital offense must now include consideration of: (1) the juvenile’s chronological age at the time of the offense and the hallmark features of youth, such as immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile’s diminished culpability; (3) the circumstances of the offense; (4) the extent of the juvenile’s participation in the crime; (5) the juvenile’s family, home, and neighborhood environment; (6) the juvenile’s emotional maturity and development; (7) whether familial and/or peer pressure affected the juvenile; (8) the juvenile’s past exposure to violence; (9) the juvenile’s drug and alcohol history; (10) the juvenile’s ability to deal with the police; (11) the juvenile’s capacity to assist his or her attorney; (12) the juvenile’s mental-health history; (13) the juvenile’s potential for rehabilitation; and (14) any other relevant factor related to the juvenile’s youth. See generally Commonwealth v. Knox. We recognize that some of the factors may not apply to a particular juvenile’s case and that some of the factors may overlap. Nevertheless, we believe that providing the trial court with guidance on individualized sentencing for juveniles charged with capital murder comports with the guidelines of Miller.

Conclusion

The juveniles have failed to show that the holding in Miller requires this Court to dismiss the capital-murder indictments against them. Accordingly, their petitions for a writ of mandamus are denied.
1120140 — PETITION DENIED.
1120202 — PETITION DENIED.
STUART, PARKER, MAIN, WISE, and BRYAN, JJ., concur.
SHAW, J., concurs in part and concurs in the result.
MOORE, C.J., and MURDOCK, J., concur in the result.

. Some offenses are outside the Criminal Code, such as drug offenses, which are governed by the Alabama Uniform Controlled Substances Act, § 20-2-1 et seq., Ala.Code 1975.

. The plain meaning of "capital” is the possibility of the death penalty. "Capital” is *1281 defined in Black's Law Dictionary as ”[p]un-ishable by execution; involving the death penalty.” Black's Law Dictionary 236 (9th ed. 2011).

. The Supreme Court stated that it believed "appropriate occasions for sentencing juveniles to the harshest penalty will be uncommon.” 567 U.S. at-, 132 S.Ct. at 2455.

. Other jurisdictions have addressed Miller. See, e.g., Ortiz v. State, 119 So.3d 494 (Fla.Dist.Ct.App.2013)(holding that minor defendant was not entitled to a writ of prohibition directing the trial court to dismiss his capital-murder indictments where he argued that only statutorily authorized sentences of death and life imprisonment without parole had been declared unconstitutional but the Florida courts had established a valid sentencing option under Miller); People v. Banks, [No. 08CA0105, September 27, 2012]-P.3d - (Col.Ct.App.2012) (holding that because minor defendant was mandatorily sentenced to life imprisonment without parole and because his case was still pending on direct appeal when Miller was released, the minor defendant was entitled to a new sentencing hearing); In re Morgan, 713 F.3d 1365 (11th Cir.2013) (holding that the rule established in Miller was not substantive and has not been made retroactive by the Supreme Court, and that juvenile could not bring a second or successive motion to vacate, set aside, or correct a sentence); State v. Simmons, 99 So.3d 28 (La.2012)(allowing for resentencing on collateral review); and People v. Pacheco, 991 N.E.2d 896, 372 Ill.Dec. 406 (Ill.App.2013) (declining to extend Miller to juveniles sentenced to terms other than life imprisonment without parole).