KELLUM, Judge.
The appellant, Jertavis Foye, was convicted of murder made capital because it was the intentional murder of two individuals during one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. The circuit court sentenced Foye to life in prison without the possibility of parole and ordered Foye to pay $100 to the crime victims compensation fund and court costs.
The evidence presented at trial established the following pertinent facts. On the night of August 9, 2008, the bodies of a black male and black female were found *856 lying on Macon County Road 2. Both individuals had shotgun wounds to the head. Special Agent Lee McWaters with the Alabama Bureau of Investigation was called to the scene of the murders. The female was identified as Erika Black and the male was identified as Clint Donner. Donner’s right front pants pocket had been pulled inside out. A spent 20-gauge shotgun shell was found on the scene. A Ford Crown Victoria automobile was found “[o]ff of County Road 2 and in a private drive ... a subdivision but it was in the small area and the condition of the car was totally burned down.” (R. 57.)
Agent McWaters interviewed Foye on August 19, 2008, at the Lee County Juvenile Detention Center where Foye was being held on a probation violation. Foye, who was 17 years old and a minor at the time, was advised of his juvenile Miranda[1] rights, and he elected to waive those rights. In a subsequent statement, Foye told Agent McWaters that “he did not know Donner or [Bjlaek” and “that he had been playing basketball [on August 9, 2008,] all day until dark and then he went to a club that evening then after the club around 2 o’clock in the morning he went home.” (R. 36.) After that interview, Agent McWaters gathered evidence that indicated Foye had been involved in the murders, and he obtained a warrant for Foye’s arrest.
On August 30, 2008, after being told that Foye wanted to speak with him, Agent McWaters went to the Macon County Sheriffs Office where Foye signed a waiver of his Miranda rights. Foye then told Agent McWaters that Donner and another individual had “tied up [Foye] and took him to a drug house where they were cooking dope.” (Supp. R. 14.) Foye also said that, after transferring Foye from house to house and holding him for a week, Donner picked him up. Donner wanted Foye to ride with him to Columbus, Georgia, to provide protection during a drug deal. The drug deal was not consummated, and Donner and Foye returned to Macon County, where they picked up Black. That night, Donner put a shotgun and a pistol on the front seat of the car and later “Donner gave [Foye] a comment about kill or be killed.” (Supp. R. 18.) After hearing a “click,” Foye pushed “Donner’s face towards the windshield.” (Supp. R. 17-18.) Donner braked and Black held the steering wheel and got the handgun; Foye fired the shotgun. Black then got out of the car and Foye got out to look for her. Foye found Black and shot her.
On September 4, 2008, the Macon County Sheriffs Office contacted Agent McWa-ters and informed him that Foye wanted to speak with him again. Agent McWa-ters went to the sheriffs office to interview Foye. This time Agent McWaters “did not have any more juvenile rights waiver forms” and used a standard Miranda form before interviewing Foye. (R. 46.) In that interview, Foye told a similar version of events that he had given in the August 30, 2008, interview. This version, however, differed in that he stated that he had been “sexually assaulted by the four gentlemen or men that followed him” to the house where he was held captive. (Supp. R. 21.) He also said that, after he had first fired the shotgun in the car, he grabbed more shotgun shells and then fell out of the car. While on the ground, Foye said, he shot Black. After shooting Black, Foye crawled to the front of the car and opened the door. Donner then fell out and Foye used a knife he found to cut the ropes that *857 had been tied around his ankles. As Foye drove off, Black fell “out of the car on the passenger side because the door was open.” (Supp. R. 23.)
Foye took Agent McWaters and Marcus Walker, an investigator with the Macon County Sheriffs Office, to where a 20-gauge shotgun was located.[2] The shotgun was several feet off a dirt road in the woods. The shotgun contained a spent shell casing.
Doctor Steven Boudreaux, a senior medical examiner with the State of Alabama Department of Forensic Sciences, performed the autopsies on Donner and Black. “Donner had a shotgun entry wound in the right side of his neck.” (R. 66.) The “pellets went through his neck lacerating his carotid artery, his jugular vein and actually penetrated his spinal cord in his neck.” (R. 66.) This gunshot wound was the cause of Donner’s death. Doctor Boudreaux was able to remove the pellets and wadding[3] from Donner’s neck. The characteristics of the entry wound on Donner’s neck indicated that the muzzle of the shotgun had been more than three feet from Donner’s neck when the shotgun was discharged.
Doctor Boudreaux determined that Black had “sustained a shotgun injury to the right side of [her] head.” (R. 70.) The characteristics of the entry wound on Black’s head caused Dr. Boudreaux to conclude that Black had been more than three feet from the muzzle of the shotgun when the shotgun was discharged. He was able to recover pellets and wadding from Black. Doctor Boudreaux determined that Black “died as a result of a shotgun wound.” (R. 73.)
The burned Ford Crown Victoria automobile in which Donner and Black had been riding was taken to Montgomery where Jimmy Graham, a fire marshal with the Alabama State Fire Marshals Office, inspected it. Graham testified that “[e]very combustible [part of the car] burned, which is unusual for an ordinary fire.” (R. 132.) The “metal brackets that hold[ ] the window glass up [were] down on the driver’s side in the front end to the back.” (R. 132.) Leaving a window down is “one thing that people do when they want to burn [a car] good.” (R. 133.) The fact that the fire burned hot enough to burn all combustible parts of the car indicated to Graham that an accelerant was used to start it.
Jason Williams, Black’s brother-in-law, testified that between noon and 4:00 p.m. on August 9, 2008, Black came to his house to pick up her daughter. Donner and Foye were with her.
Officer Walker testified that, following the murders, he executed a search warrant at Foye’s home. Two 20-gauge shotgun shells were found in a building on that property. In that same building “two subpoenas for the juvenile court ... in Macon County” listing Foye as the defendant were also found. (R. 180.)
Jeffery Floyd, Foye’s cousin, testified that after the murders Foye told Floyd that he had been with “some other people ... on a dark back road” and the people had robbed someone. (R. 238.) Foye told Floyd that he had seen the robbery and that the plan had been to rob Donner *858 because he had $30,000 in cash on his person. Floyd also testified that Foye had told him that Foye had “made a mistake” and that he had been “riding down a dark road with the girl and the boy, and he saw the girl pass a pistol over to the boy. He heard the pistol come off safety, so he shot the boy with the gun and the girl said, You shot Clint,’ and then he shot the girl in the face.” (R. 240.)
Foye called several witnesses to testify on his behalf. One defense witness testified that Foye had been mentioned as a possible suspect in the murders while another testified that Tim Woods had said that Foye had been in the car with Donner and Black. Another witness was called so that records of the Macon County Sheriffs Office could be introduced to establish that Tim Woods had been incarcerated at the jail from August until October 2008. Other defense witnesses testified about where Foye had been on the night of the murders.
After both sides rested, the circuit court instructed the jury on the applicable principles of law. The jury returned a verdict finding Foye guilty of capital murder. This appeal followed.
I.
Foye contends that the circuit court erred in admitting into evidence at trial his second and third statements made to law enforcement. Specifically, Foye contends that he was not apprised of his juvenile Miranda rights before he made those statements.
On March 22, 2011, Foye filed a motion to suppress statements regarding the murders.[4] On March 25, 2011, the circuit court conducted a hearing on that motion. During that hearing, McWaters testified that he first spoke with Foye on August 19, 2008, while Foye was being held in the Lee County Juvenile Detention Center. Before that interview, Officer Walker, an investigator with the Macon County Sheriffs Office who was investigating another case, reviewed a juvenile Miranda rights and waiver-of-rights form with Foye, who then signed the waiver form, waiving those rights.
Following Foye’s arrest, a representative of the Macon County Sheriffs Office contacted Agent McWaters on August 30, 2008, and told him that Foye wanted to speak with Agent McWaters. Agent McWaters went to the Macon County Sheriffs Office where Marvin Crayton of the sheriffs office reviewed a standard Miranda notification-’of-rights and waiver-of-rights form with Foye, who signed the waiver form. Agent McWaters subsequently reviewed a juvenile Miranda notification-of-rights and waiver-of-rights form with Foye, who executed the waiver portion of the form. Agent McWaters did not threaten, coerce, or intimidate Foye to get him to sign the waiver. Following Foye’s execution of the waiver-of-rights form, Agent McWaters interviewed him.
On September 4, 2008, the Macon County Sheriffs Office again contacted Agent McWaters and informed him that Foye wanted to speak with him. Agent McWa-ters went to the sheriffs office to interview Foye. This time Agent McWaters “did not have any more juvenile rights waiver forms” and used a standard Miranda form before interviewing Foye. (R. 46.) As discussed above, Foye’s version of the August 9, 2008, events differed in the third interview in that Foye included a claim that he *859 had been sexually assaulted and in how he had shot Donner and Black.
Following the suppression hearing, the circuit court denied the motion to suppress.
The Alabama Supreme Court has explained:
“[A] child who is taken into custody must be informed of his Miranda rights, and pursuant to Rule 11, Ala. R. Juv. P., he must be informed that he has the right to communicate with his parent or guardian and, if necessary, that reasonable means will be provided for him to do so.”
Ex parte Hall, 863 So.2d 1079, 1085 (Ala. 2003).[5]
Before its abrogation, Rule 11(B), Ala. R. Juv. P., provided:
“Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
“(1) That the child has the right to counsel;
“(2) That if the child is unable to pay a lawyer and if the child’s parents or guardian have not provided a lawyer, one can be provided;
“(3) That the child is not required to say anything and anything the child says may be used against the child;
“(4) That if the child’s counsel, parent, or guardian is not present, then the child has the right to communicate with them, and that, if necessary, reasonable means will be provided to the child to do so.”
The Supreme Court has also stated:
“This Court recognizes that the Court of Criminal Appeals has a line of cases holding that once Miranda warnings have been given and the defendant has made a knowing, intelligent, and voluntary waiver, a failure to repeat the warnings will not automatically preclude the admission of an inculpatory statement. See Hollander v. State, 418 So.2d 970 (Ala.Crim.App.1982) (between 1 and 1.75 hours passed while police were searching house; no repeat of Miranda warnings); Fagan v. State, 412 So.2d 1282 (Ala.Crim.App.1982) (lapse of 3 1/2 hours did not require a renewed warning); Smoot v. State, 383 So.2d 605 (Ala.Crim.App.1980) (lapse of 30 minutes between the warnings and the statement); Burlison v. State, 369 So.2d 844 (Ala.Crim.App.1979) (lapse of 45 minutes between the reading of Miranda warnings and the taking of a statement did not require a repeat of the warnings); Johnson v. State, 56 Ala.App. 583, 324 So.2d 298 (1975) (three to four days, with a reminder of the warnings); Jones v. State, 47 Ala.App. 568, 258 So.2d 910 (1972) (warning was given one day and statement made the following morning). However, we note that in most of those cases the time lapse was not more than a few hours. In none of those eases did the lapse exceed a few days without at least a reminder of the warnings. See Johnson v. State, supra.”
Ex parte Landrum, 57 So.3d 77, 82-83 (Ala.2010) (quoting Ex parte J.D.H., 797 So.2d 1130,1131-32 (Ala.2001)).
Although the Supreme Court has “emphasized other circumstances, besides the amount of time, that warranted suppressing the statement,” id., the amount of delay between August 30, 2008, and Septem *860 ber 4, 2008, resulted in a waiver of Foye’s rights that was not voluntary. Although Foye apparently initiated the contact with Agent McWaters, he did so after being confined for several days. The only explanation of Foye’s rights that was provided to him before Foye made his third statement to law enforcement did not comply with Rule 11(B), Ala. R. Juv. P. Therefore, the admission of Foye’s September 4, 2008, statement was erroneous.
That conclusion does not, however, end our analysis. In Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003), this Court stated:
“ ‘The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.’ Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246,113 L.Ed.2d 302 (1991).
“ ‘After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Crim.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); [Ala.] R.App. P. 45.... In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a nonconstitutional error to be deemed harmless, the appellate court must determine with “fair assurances ... that the judgment was not substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239,1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir. 1994).... In order for the error to be deemed harmless under Ala. R.App. P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant’s substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’
“Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
889 So.2d at 666.
The record in the instant case indicates that even without the admission of Foye’s third statement, the State presented overwhelming evidence of Foye’s guilt. In the second statement Foye made to law-enforcement officials, Foye told Agent McWaters that he had shot Donner and Black. Further, Foye told Floyd that there had been a plan to rob Donner and that Foye had shot Donner and Black. Foye took law enforcement to the location of a 20-gauge shotgun that had been disposed of in the woods next to a dirt road. A spent 20-gauge shotgun shell was found by the victims and two 20-gauge shotgun shells were found during a search of Foye’s residence. Therefore, in light of the evidence presented at trial and the totality of the circumstances, we conclude that the circuit court’s failure to suppress Foye’s third statement was harmless beyond a reasonable doubt. See Lewis v. State, supra.
*861 II.
Foye also contends that the circuit court erred in denying him youthful-offender status. The record indicates that Foye moved for youthful-offender status on April 8, 2009. On that same date, the circuit court ordered that the Macon County Parole and Probation Office conduct an investigation of Foye. • That investigation was completed on June 23, 2009, and on June 24, 2009, the circuit court considered “all submissions” and denied Foye’s application for youthful-offender status. (C. 18.) Foye subsequently filed a motion asking the circuit court to conduct a hearing to reconsider his request for youthful-offender status. On March 25, 2011, the circuit court denied that motion. Nothing in the record indicates that Foye objected to the denial of his application for youthful-offender status. Therefore, this issue was not properly preserved for our review. See, e.g., Murphy v. State, 108 So.3d 531 (Ala.Crim.App.2012).
Morever, even if the issue had been preserved for our review, Foye would not be entitled to any relief. We have explained:
“A trial court has almost absolute discretion in deciding whether to grant or to deny a defendant’s application for youthful-offender status, and this Court will not overturn such a decision absent an affirmative showing that the decision was arbitrary or that it was made without some investigation or examination of the defendant. Burks v. State, 600 So.2d 374 (Ala.Crim.App.1991). The trial court need not articulate on the record its reasons for denying a defendant youthful-offender status. Reese v. State, 677 So.2d 1239 (Ala.Crim.App.1996). ‘All that is required is that the trial court undertake an examination of the defendant sufficient to enable it to make an intelligent determination as to whether, in its discretion, the defendant is eligible for treatment as a youthful offender.’ Gamble v. State, 791 So.2d 409, 419 (Ala.Crim.App.2000) (citing Fields v. State, 644 So.2d 1322 (Ala.Crim.App.1994)). ‘Generally, the trial court considers the nature of the crime charged, any prior convictions, the defendant’s age, and any other matters deemed relevant by the court.’ Reese v. State, 677 So.2d at 1240.”
Murphy, 108 So.3d at 539.
In the instant case, the circuit court ordered that a probation officer conduct a youthful-offender investigation. Following that investigation, the circuit court considered all submissions and denied Foye youthful-offender status. Consequently, because the circuit court investigated Foye and considered the results of that investigation before ruling on Foye’s request for youthful-offender status, it did not abuse its discretion when it denied Foye’s request. .
III.
. Foye next contends that the evidence was insufficient to sustain his conviction.
We have held:
“ ‘ “ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact *862 could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.’” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” ’ ”
Ingram v. State, 878 So.2d 1208,1210 (Ala.Crim.App.2003) (quoting Ex parte Bankston, 358 So.2d 1040,1042 (Ala.1978)).
Foye was charged with violating § 13A-5-40(a)(10), Ala.Code 1975.
“To sustain a conviction in the present case, the State had to prove (1) that [Foye] intentionally caused the deaths of [Erika Black and Clint Donner]; and (2) that the murder of both victims was the result of one act or pursuant to one scheme or course of conduct.”
Living v. State, 796 So.2d 1121, 1141 (Ala.Crim.App.2000), cert. denied, 796 So.2d 1121 (Ala.2001).
When viewed in the light most favorable to the State, the evidence was sufficient to demonstrate that Foye intentionally caused the death of Black and Donner and that the murders were “the result of one act or pursuant to one scheme or course of conduct.” Id. Black'and Donner had both been murdered with a 20-gauge shotgun and were found lying on Macon County Road 2. Foye had been seen with Black and Donner on the afternoon of the murder. Jeffrey Floyd testified that Foye had told him that Foye had shot Black and Donner and that Foye “and some other boys” had planned to rob Donner because they believed that Donner had $30,000 in cash on his person. (R. 239.) When he was found, Donner’s pants pocket “had been pulled out,” suggesting that he had been searched and that something may have been removed from his person. (R. 30.) Foye led law-enforcement officers to where a 20-gauge shotgun had been disposed of in thick woods. Two 20-gauge shotgun shells were found at Foye’s home. In his August 30, 2008, interview, Foye told Agent McWaters that he had shot Donner and Black with a shotgun. This evidence was sufficient to allow the jury to conclude that Foye intentionally caused the deaths of Black and Donner and that the murder of both victims was the result of one act or pursuant to one scheme or course of conduct. Therefore, we affirm Foye’s conviction as to this issue.
IV.
Finally, Foye contends that the circuit court’s mandatory sentence of life imprisonment without the possibility of parole was unconstitutional given Foye’s age at the time of the offense for which he' was convicted. Foye contends that the United States Supreme Court’s holding in Miller v. Alabama, 567 U.S.-, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), prohibits the imposition of a mandatory sentence of life imprisonment without the possibility of parole for juvenile offenders.
Foye is correct, insofar as Miller held that “the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.” Miller, 567 U.S. at -, 132 S.Ct at 2469. In Miller, however, the United States Supreme Court clarified that its holding did not prohibit a sentence of life imprisonment without the *863 possibility of parole for juvenile offenders. Instead, the Court in Miller required sentencing authorities to consider the characteristics of the juvenile offender and the details of the offense before imposing a sentence of life imprisonment without the possibility of parole.
The Alabama Supreme Court recently addressed the United States Supreme Court’s holding in Miller in Ex parte Henderson, 144 So.3d 1262 (Ala.2013). In Henderson, two juvenile defendants filed petitions for a writ of mandamus seeking the dismissal of capital-murder indictments, arguing that “Alabama’s capital-murder statute is unconstitutional as applied to them because the mandatory sentencing structure provides that all defendants charged with a capital offense, including juveniles, must receive either a sentence of death or a mandatory sentence of life imprisonment without parole.” Ex parte Henderson, 144 So.3d at 1280. Citing Miller, the juvenile defendants argued that they could not be sentenced to life imprisonment without the possibility of parole. Our Supreme Court, however, disagreed with the juvenile defendants’ contention that Miller prohibited the imposition of a life-in-prison-without-the-possibility-of-parole sentence, stating:
“The Miller Court was careful to clarify that its holding was not a categorical prohibition of a sentence of life imprisonment without parole for juveniles, but rather required the sentencer to consider the juvenile’s age and age-related characteristics before imposing such a sentence. The Supreme Court did ‘not foreclose a sentencer’s ability to [impose a sentence of life imprisonment without parole for a juvenile] in homicide cases,’ 567 U.S. at-, 132 S.Ct. at 2469, but required ‘only that a sentencer follow a certain process — considering an offender’s youth and attendant characteristics — before imposing’ life without parole. 567 U.S. at -, 132 S.Ct. at 2471.”
Ex parte Henderson, 144 So.3d at 1277.
In keeping with its understanding of the United States Supreme Court’s holding in Miller, our Supreme Court provided trial courts with guidance in the event juveniles are convicted of capital murder:
“We agree with the juveniles that the Miller Court did not delineate specifically which factors to use in sentencing a juvenile convicted of a capital offense. We find helpful Commonwealth v. Knox, 50 A.3d 732 (Pa.Super.Ct.2012), which ordered that a juvenile sentenced to a mandatory life-without-parole sentence must be resentenced with a consideration of the principles annunciated in Miller. We hold that a sentencing hearing for a juvenile convicted of a capital offense must now include consideration of: (1) the juvenile’s chronological age at the time of the offense and the hallmark features of youth, such as immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile’s diminished culpability; (3) the circumstances of the offense; (4) the extent of the juvenile’s participation in the crime; (5) the juvenile’s family, home, and neighborhood environment; (6) the juvenile’s emotional maturity and development; (7) whether familial and/or peer pressure affected the juvenile; (8) the juvenile’s past exposure to violence; (9) the juvenile’s drug and alcohol history; (10) the juvenile’s ability to deal with the police; (11) the juvenile’s capacity to assist his or her attorney; (12) the juvenile’s mental-health history; (13) the juvenile’s potential for rehabilitation; and (14) any other relevant factor related to the juvenile’s youth. See general *864 ly Commonwealth v. Knox. We recognize that some of the factors may not apply to a particular juvenile’s case and that some of the factors may overlap. Nevertheless, we believe that providing the trial court with guidance on individualized sentencing for juveniles charged with capital murder comports with the guidelines of Miller.”
Ex parte Henderson, 144 So.3d at 1284 (footnote omitted).
Foye’s capital-murder conviction is affirmed; however, because Foye was sentenced to a mandatory term of life imprisonment without the possibility of parole as a juvenile offender for the commission of capital murder, we reverse Foye’s sentence and remand this case to the Macon Circuit Court for that court to conduct a new sentencing hearing at which it shall consider the factors set forth by our Supreme Court in Henderson and resentence Foye accordingly. The circuit court shall take all necessary action to ensure that the circuit clerk makes due return to this Court at the earliest possible time and within 84 days of the release of this opinion. The return to remand shall include a new sentencing order and a transcript of the proceedings.
AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED FOR NEW SENTENCING PROCEEDINGS*
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Rule 11, Ala. R. Juv. P. (juvenile Miranda),

. The record is unclear as to when this event occurred. Agent McWaters testified that he had planned to find the shotgun based on information Foye had given him. He also testified that Foye "offered to take us to it” and that the offer occurred when Agent McWaters "was getting ready for an Alabama/Aubum softball game.” (R. 49.)

. Doctor Boudreaux testified that wadding "holds the shotgun pellets together.” (R. 66.)

. In his motion, Foye did not specify which statements he sought to have the circuit court suppress.

. Effective January 1, 2009, § 12-15-202, Ala.Code 1975, which codifies the rights, of minors, abrogated Rule 11, Ala. R. Juv. P.

 Note from the reporter of decisions: On April 18, 2014, on return to remand, the Court of Criminal Appeals affirmed, without opinion.